UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- v. -<br><br>HAJI NAJIBULLAH,<br><br>     Defendant. | (S2) 14 Cr. 401 (KPF) |

## HAJI NAJIBULLAH'S UNCLASSIFIED SENTENCING SUBMISSION

TAMARA GIWA, ESQ.
Federal Defenders of New York, Inc.
52 Duane Street, 10th Floor
New York, New York 10007

By: Andrew John Dalack
   Mark Gombiner
   Ariel Werner
   (212) 417-8768
   andrew_dalack@fd.org

*Counsel for Haji Najibullah*

Attn: JAY CLAYTON, ESQ.
   United States Attorney
   Southern District of New York

   By: AUSA Samuel Adelsberg
     AUSA David Robles
     AUSA Jacob Gutwillig

### I.    Introduction

For nearly 20 years, between October 7, 2001, and August 30, 2021, the United States military fought the Taliban in Afghanistan. Approximately 47,000 Afghan civilians died during the hostilities. Nearly 2,500 American soldiers were also killed in combat. Throughout the war, the Taliban regularly kidnapped civilians, including journalists and aid workers, and used them as bargaining chips in negotiating the release of Taliban prisoners at Bagram, Guantanamo Bay, and elsewhere.

Taliban leaders responsible for some of the worst atrocities committed during the war presently hold power in Afghanistan. Ranking members of the Haqqani Network, for example, currently enjoy official governmental status in Afghanistan and diplomatic privileges. They are free to travel, work, and live without fear of arrest or harassment. Many of the Taliban who occupy high-level positions in today's Afghan government were once considered the most feared terrorists on the planet and held spots on the FBI's most wanted list, with millions of dollars' worth of bounties on their heads. None of them have been brought to the United States and prosecuted for the crimes they committed against United States soldiers and American and Afghan civilians.

Against this backdrop stands Haji Najibullah. Neither a prominent commander nor political leader, Najibullah is the only native, Pashtun Afghan Taliban member who has ever been brought to court in the United States and prosecuted for crimes committed during the American war in Afghanistan. For the

1

past six years, since his extradition from Ukraine in October 2020, Najibullah has endured dangerous and inhumane jail conditions while litigating various aspects of the government's case against him. When the government ultimately made Najibullah a meaningful plea offer, agreeing to drop charges, including murder, that carried a mandatory sentence of life imprisonment, he readily accepted responsibility for his role as a low-level commander in the Taliban between 2007 and 2009, and admitted his role in the November 2008 hostage taking of then-New York Times journalist ██████████ and his Afghan companions.

Najibullah has admitted to serious crimes, but there is also mitigation favoring a significant variance from the statutory maximum sentence of life imprisonment. Perhaps the chief mitigating factor is Najibullah's acceptance of responsibility. Had Najibullah gone to trial and lost on all counts, his convictions would have required a life sentence. It is axiomatic that Najibullah should not get the same sentence after pleading guilty to fewer counts, an act that reflects not only personal accountability and genuine remorse, but also a good-faith desire to provide victims with closure. A variance is also necessary to account for Najibullah's tragic personal history and family circumstances, along with his relatively low-level position within the Taliban and the totality of the circumstances surrounding ██████ ██████s kidnapping.

Najibullah fought with the Taliban in Wardak Province knowing that his support would facilitate attacks on U.S. soldiers, and he does not contest that his material support resulted in the deaths of three U.S. soldiers and their Afghan

2

interpreter on June 26, 2008, in the Tangi Valley. But, as laid out in the defense's classified sentencing submission and the attached report from Professor Michael Semple, Najibullah did not personally participate in or direct that attack, and he is not responsible for the heinous actions of the Taliban commander who did. And while Najibullah was a local commander, he held little influence within the Taliban hierarchy. He may have aspired to more relevance, prestige, and power, but he never achieved it. His relatively low rank within the Taliban and limited stint as a commander warrant a downward variance.

There are mitigating aspects to Najibullah's role in the kidnapping as well. Najibullah admits kidnapping ████ ████ and his companions and holding them hostage, which warrants a serious sanction. But the main architects and overseers of the kidnapping were leaders of the Haqqani Network—specifically Badruddin Haqqani (co-conspirator 1 in the original indictment) and his brother, Sirajuddin Haqqani. Although Badruddin is dead, Sirajuddin is presently the Interior Minister of Afghanistan and not in any fear of prosecution. And as addressed in the defense's classified submission, there are other features of the kidnapping and Najibullah's conduct during the years that followed that demonstrate a genuine effort to change and militate against a life sentence.

Although a substantial sentence is warranted in this case, Haji Najibullah is not an unrepentant terrorist deserving of a sentence guaranteeing that he will only leave prison in a pine box. Accordingly, the Court should sentence Najibullah to 18 years' imprisonment, a substantial term that adequately balances the need to

3

impose just punishment and promote respect for the law with Najibullah's individual characteristics and the totality of the circumstances surrounding his offenses.

## II. A downward variance is warranted by Najibullah's difficult personal circumstances and mitigating path to the Taliban.

Nesar Ahmed Mohammed, also known as Haji Najibullah, or "Najib," was born on or about January 1, 1976, in Zabul Province, Afghanistan. Najib's mother, Bibi Najihba, is 75 years old and lives in Afghanistan with her children and grandchildren. Najib's father, Haji Alum Gul, died a few months after Najib was arrested and brought to the United States in October 2020. Najib has eight surviving siblings. Seven of them live in Afghanistan and one lives in Pakistan.

In June 2014, Najib's brother, Timor Shah, was killed by Taliban fighters; Najib was injured in the same attack. The Taliban, specifically the Haqqani Network, carried a vendetta against Timor Shah and Najib, blaming them for ███ ███'s escape from captivity in June 2009. Najib and Timor Shah were extremely close, and Timor Shah was a leader within Najib's family. They have never fully recovered emotionally from his killing.

Najib is married and has six children. His youngest daughter, "SA," is five years old and was born shortly after Najib was extradited to the United States. Najib prays that he will get the chance to meet her someday.

Najib's wife and children live with his mother and several of his siblings and their children in a single home in Afghanistan. With approximately 41 people under one roof, it is a stifling environment. Najib is persona non grata with the Taliban,

4

who still blame him for Mr. █████'s escape, and his family has been persecuted by the current government. After Timor Shah's killing in 2014, Najib managed to relocate his family to Dubai and the United Arab Emirates, where they lived peaceful and law-abiding lives. However, within a year of Najib's arrest in this case, his family was deported to Afghanistan. The Gulf immigration authorities tied their removal to Najib's widely publicized prosecution in the United States. Najib's family members remain unemployed and in a state of purgatory, surviving day-to-day based on the generosity of extended family and friends.

For the past five-and-a-half years, Najib has been unable to do anything to help his family. He relies on his younger brother Rafi for updates and can hear the pain and sadness in Rafi's voice every time they speak. But Najib is no stranger to adversity and struggle. Rather, life has repeatedly placed obstacles in Najib's path, providing critical context for his offenses.

### A. Haji Najibullah was born into war and exposed to extreme violence from an early age.

Najib's paternal grandfather was a successful businessman in Zabul who helped Najib's father, a schoolteacher, provide for Najib and his siblings. Yet the grandfather's resources could not insulate his family from the violence and chaos that have plagued Afghanistan for decades. In this way, Najib's story is inextricably intertwined with the story of Afghanistan. Years of military occupation and civil war forced Najib and his siblings to grow up too quickly and find ways to survive.

By the time Najib was born, Afghanistan was already a nation in turmoil. In 1973, King Mohammad Zahir Shah was deposed after a relatively peaceful forty-

year reign, giving way to a short-lived republic.[1] The year of Najib's birth, 1978, marked the Saur Revolution, a violent coup d'état by the Marxist-Leninist People's Democratic Party of Afghanistan ("PDPA"). One year later, in December 1979, the Soviet Union invaded to prop up the PDPA in its conflict with the mujahideen, anti-communist Islamists armed and funded by foreign powers including Pakistan, Saudi Arabia, and the United States. That conflict, the Soviet-Afghan War, lasted over a decade, through Najib's eleventh birthday.[2]

When the Soviets finally withdrew from Afghanistan, they left behind a country in ruin.[3] Historian Carter Malkasian describes the war's aftermath:

> The Soviet-Afghan War wrought dramatic social and economic change on Afghanistan. One million Afghans died. Another 4 million fled to Pakistan and Iran, where they lived in refugee camps. Certain districts in the Afghan countryside all but emptied of people. Education and medical care ground to a halt. A generation of Afghans had little chance at secondary education. For primary education, madrasas or schooling at a nearby mosque were often all that was possible. Agricultural production was disrupted. War stopped goods from getting to market. Canals and other infrastructure fell into disrepair. The social and economic effects of the war set the stage for decades of hardship.

---

[1] Prior to the rule of King Shah, Afghanistan had endured centuries of conflict, both with external invaders and internally amongst regional and ethnic groups. The British alone "spent nearly a century trying to control Afghanistan." Carter Malkasian, *The American War in Afghanistan: A History* (Oxford Univ. Press 2021), at 15. As a result, "[t]hrough the centuries, fighting invaders became part of what it meant to be Afghan. As Afghan historian M. Hasan Kakar wrote in 1993, 'Afghans have a name for resisting invaders and protecting their freedom and independence.'" *Id.*

[2] "In Afghanistan, [the War] was known to the mujahideen simply as the *jihad*. Religious leaders issued fatwas (edicts) blessing war against the Soviets as a religious duty. An estimated 150,000 Afghans, across all ethnic groups, fought as mujahideen. … The United States viewed the war as an opportunity to wear down the Soviet Union." *Id.* at 29. Thus, throughout Najib's early childhood, Afghanistan was a central battlefield in the Cold War.

[3] The Soviet withdrawal began in 1986 and was completed in 1989. The Soviet-backed regime remained in power until 1992.

Carter Malkasian, *The American War in Afghanistan: A History* (Oxford Univ. Press 2021), at 32.[4]

The war also decimated Afghanistan's state structures, leading to an internal power struggle among religious leaders and warlords who had gained power and prominence as mujahideen commanders. *Id.* This ensuing civil war was, for many Afghans, "the darkest chapter of their four decades of conflict, marked by widespread destruction and atrocities." *Id.* at 33. The country was "sliced up between warlords." *Id.* "Anarchy reigned." *Id.* Kabul was "a war zone," ravaged by fighting, indiscriminate rocket fire, looting, murder, and rape. *Id.* In the rural provinces, mujahideen commanders and their undisciplined militias wreaked havoc. *Id.* at 36.

During this period, social order and the rule of law were absent. There were widespread reports of women and boys being abducted, abused, and raped, and of militias seizing property, robbing businesses, and imposing illegal taxes. Ethnic minority groups were targeted for killings, mass detention, disappearances, and reprisals. Civilians had no recourse for these horrors, as there were no functional courts or law enforcement to speak of. The economy lay in tatters. Afghanistan's roads, markets, and supply chains had been destroyed; food was scarce; inflation

---

[4] Hard statistics are hard to find, and other scholars have estimated an even greater human toll than Malkasian. According to a Middle East Institute report, for example, an estimated 1.8 million Afghans were killed, 1.5 million (including 300,000 children) were disabled, 7.5 million became refugees, and more than 14,000 villages were destroyed in the war. M. Siddieq Noorzoy, "Afghanistan's Children: The Tragic Victims of 30 Years of War" Middle East Institute (December 2009), *available at* https://mei.edu/publication/afghanistans-children-tragic-victims-30-years-war/.

7

was widespread. This, Malkasian explains, "was the environment that spawned the Taliban." *Id.* at 33.

The war and its aftermath defined Najib's childhood. He was eight years old when he first witnessed death. It was Ramadan, and his community was preparing to break fast. He and a group of children, friends and neighbors, were playing outside under a tree near their home in Zabul Province. With dates tucked away in their palms and pockets, they eagerly awaited the call to prayer. But before the start of Iftar, Najib's father summoned him and asked him to go buy milk. Najib and his older sister walked to the store, about eight minutes away, bought milk, and started walking home. They were almost back when they watched in horror as a missile fell amidst their playmates. Forty years later, Najib still recalls the jarring sight of a friend cradling his brother's lifeless body. He remembers the cruelty of a single projectile taking three children from one family and how another slain child's bereft mother seemed to lose her mind.

For Najib, as for many Afghans, the post-war period was even more brutal than the war itself had been. He remembers the feeling of living under constant threat of violence from warlords. He remembers the checkpoints that dotted the country, where thugs collected illegal tolls and taxes. And he remembers the senseless violence. One incident stands out. Najib, then 11 years old, and his father, a schoolteacher, were traveling from their home in Zabul over 100 kilometers to Kandahar to buy supplies for his sister's engagement party. They undertook much of the journey by bicycle due to road closures. Five kilometers from home, with bikes

laden with gifts of perfume and cologne, they were stopped by a mujahideen militia. Their commander was a man who at one time had worked for Najib's family in fields owned by Najib's grandfather and later risen to prominence. The commander ordered them to follow his militia to its headquarters, where he examined their perfume and cologne and accused them of transporting alcohol. His fighters forced Najib's father to the ground, tied his legs, and beat him with cables. Najib stood by powerlessly. Decades later, he cannot erase the memory of his father being whipped and crying for help.

Later that same year, Najib's father was jailed by the Soviet-backed regime based on a false accusation of ties to a different mujahideen commander. He was interrogated, tortured, and beaten for two months and imprisoned for six. With his father in jail, 11-year-old Najib, the eldest son, was left in charge at home and saddled with adult responsibility. He recalls traveling on his own to visit his father in a Kabul jail, where Najib found him caged and bedraggled.

After these incidents, Najib's parents decided to leave their tribal home in Zabul. In 1987, much of the family's land had been seized for a military base, and they hoped to find greater economic opportunity in Kabul. More importantly, having suffered violence at the hands of both the mujahideen and the Soviet-backed government, they hoped to find safety in the capital. The departure itself would be dangerous; the roads and highways were mined, and a belt of government fighters surrounded the province, blocking those who attempted to leave. To escape, they had to bribe soldiers with cash and almonds. Najib recalls that the soldiers had a

reputation for being thieves, killers, and rapists, and that his terrified mother cried relentlessly as they prepared to depart. Nevertheless, they loaded their possessions onto two donkeys, paid off the soldiers, and slipped away at dawn.

Unfortunately, life in Kabul did not provide the refuge they had dreamed of. Violence followed them. For example, Najib recalls being 15 years old and visiting a market in Koht-e Sangi, a neighborhood in western Kabul disputed by warring mujahideen factions, when they were stopped by a Shia Mujahideen commander with backing from Iran. After recognizing Najib and his father as Pashtun, the commander detained them with a crowd of other Sunni and Pashtun prisoners. They were being marched toward a shipping container when they were spotted by a militiaman whose father was a friend of Najib's father. He beckoned them, falsely claimed them as family, and spared them the fate that he said would befall the other prisoners: being burned alive in a shipping crate. Following this traumatic incident, Najib's father decided to move the family back to Zabul.

The distressing experiences Najib endured as a child and teen during the Soviet-Afghan War and the Afghan civil war left him with permanent psychological scars. Years of exposure to extreme violence left him constantly fearful and vigilant of his surroundings, distrustful of institutions, and conditioned toward self-preservation and the defense of his loved ones in a hostile world.[5]

---

[5] The psychiatric literature is clear that repeated exposure to war and civilian violence during childhood profoundly affects emotional and cognitive development, often resulting in chronic hypervigilance, trauma-related symptoms, depression, and altered decision-making processes later in life. *See* D. Bürgin et al., *Impact of War and Forced Displacement on Children's Mental Health— Multilevel, Needs-Oriented, and Trauma-Informed Approaches*, 13 *Frontiers Psychiatry* 838430 (2022). Children raised in active conflict zones often develop survival-based cognitive frameworks in which fear, immediate threat response, and environmental instability become normalized features of

### B. The Taliban movement emerged from the chaos of the civil war and recruited young men from Najib's generation as its foot soldiers.

In the mid-1990s, amidst the turmoil of civil war following the Soviet withdrawal, the Taliban rose to power. *See* Malkasian, *American War*, at 36. In Pashto, the name "Taliban" meant "students" or "seekers." The movement's founders were religious leaders who had fought in the war "and were tied to each other through schooling, mentors, combat experience, and a shared view that Afghanistan should be ruled strictly according to Islam." *Id.* They were "upset at the anarchy around them and compelled to act by the obligation in Islam to fight unjust oppression." *Id.* Their goals were popular: "institute Islamic law, remove the warlords, form a single powerful and just government in accordance with the Koran, open the main road in Kandahar, implement social reforms and eliminate corruption, and restore the country's independence and territorial integrity." *Id.* at 36-37.

After emerging from Kandahar, the Taliban spread across the nation and battled the Northern Alliance—a coalition of anti-Taliban warlords, militias, and ethnic factions—for years before capturing Kabul in 1996 and announcing themselves as the "Islamic government of Afghanistan," later the "Islamic Emirate of Afghanistan." *Id.* at 44. From that time through the American invasion in 2001,

---

daily life. *See* Claudia Catani, *Mental Health of Children Living in War Zones: A Risk and Protection Perspective*, 17 *World Psychiatry* 104 (2018).

the movement enjoyed a high degree of acceptance in large swaths of the country.

Malkasian explains:

> Harsh interpretation of Islamic law, oppression of women, executions, and stonings have draped the Taliban in infamy in the West. Their reputation in the east and south of Afghanistan—Pashtun Afghanistan—is less malevolent. […] Taliban moral authority flowed from their leaders, who were mullahs and scholars. Religious leaders had always been respected as teachers and sources of knowledge. Many Afghans accepted that religious leaders might be a reasonable alternative to the anarchic rule of the warlords and tribal leaders; they appeared to be fair arbiters and unconcerned with personal power. Islam had an appeal that transcended tribe and ethnicity.

*Id.*

Particularly in contrast with the anarchy of the civil war period, the Taliban regime was known within Afghanistan for its emphasis on "justice." *Id.* at 45. Indeed, while Westerners tended to condemn the Taliban's brutality, many Afghans, particularly in Pashtun regions exhausted by militia violence, viewed the Taliban's swift and centralized enforcement as preferable to the lawlessness that had preceded it. *Id.* at 45-46. Malkasian elaborates:

> In spite of its many shortcomings, Taliban rule was effective. Violence within their territory was limited. Law and order prevailed. For those who claim that Afghanistan is ungovernable, the Taliban offer a striking counterexample. To the people in most of the country, the Taliban proved they could end the anarchy of warlords run amok. Taliban leaders long remembered their greatest successes as stopping the anarchy of the civil war and protecting the defenseless.
>
> This finding clashes with the standard narrative of Taliban rule, which paints them as brutally oppressive, narrow-minded, and backward when it came to the nuts and bolts of running a state. The Taliban were indeed many of these things, oppressive foremost among them. But they had a penchant for unity. In coming to power, the Taliban overwrote Islamic religious methods of discipline and subordination upon tribalism and thus stabilized the country and … effectively ended the civil war. Unlike the tribal leaders and warlords, they seldom fought with each

other and instead accepted a hierarchy. Unity … allowed them to enforce harsh punishments and prevent opponents from pushing them out of power. Had their regime survived, peace may have persisted, if of an impoverished sort. In short, the Taliban could govern the 'ungovernable' land.

*Id.* at 50-51. This is not to excuse the Taliban regime's worst atrocities, including its oppression of women and brutal penalties for violations of Islamic law, or its conduct during wartime. But it is vital to understand that the movement Najib joined as a teenager was understood by many Afghans not principally as a movement of terrorists, but as a force that imposed a measure of order after years of warlord violence.[6]

It was also a movement that relied heavily on Afghanistan's beleaguered youth. As the movement spread from its birthplace in Kandahar, it heavily recruited boys and young men of Najib's generation. The Taliban's founders were "experienced mujahideen," but its "foot soldiers" were teens like Najib, who had been children during the Soviet-Afghan War and were now studying at mosques and madrasas. *Id.* at 39. Those madrasas encouraged their students to volunteer for the Taliban. *Id.* But it was not only their encouragement that led young men to join the Taliban; it was also the lack of other opportunities. Najib recalls that, during his teen years, he watched as anyone with money fled the country or tried to start

---

[6] Malkasian reflects, "Afghanistan's history since 1978 has been a story of trying to end civil war. The Taliban regime brought a few years of uneven respite before America's arrival [in 2001] jump-started the trauma. The Taliban were far from good. They oppressed women, hollowed out education, and silenced free speech. Our intervention did noble work in these spheres. But that good may not balance out the violence, death, and injury. Without our intervention, Afghans would have been deprived and oppressed, but alive. We should stand back and ask: In the name of stopping terrorism for our own sake, did we liberate, or oppress, the Afghan people?" Malkasian, *American War*, *supra*, at 8.

13

small businesses, and those who did not joined militias to earn enough money for food.

Najib was barely 20 years old when he joined. One year earlier, near the end of 1994, he married his wife and they had their first child soon after. They were living in Kabul, where Najib ran a small shop selling household items imported from Pakistan. One day, at the end of 1995, a prominent Tajik militia commander came to his store in pursuit of a woman who had taken refuge there. Najib intervened against the commander's men and protected the woman. The guards were offended and, when they saw he was Pashtun, threatened to deal with him later. That night, they returned and looted his store. When Najib reported this robbery to the police, they arrested him instead. His father secured his release a week later, but he emerged with nothing. He had sold his Toyota Corolla to start his shop, and now his shop had been looted. He feared he would be unable to support his family.

When the Taliban took Kabul in 1996, Najib joined the movement in pursuit of a government job. He had observed how the Taliban had eliminated the warlords and militias ravaging the country and significantly reduced lootings, robberies, and violence by threatening would-be criminals with severe punishments. His countrymen seemed happier and safer. People left their front doors open without worry. There was electricity. Meanwhile, he saw many of his peers join the Taliban in search of financial stability and jobs in the new government and decided to follow suit. He started in the Ministry of Defense as a security guard, patrolling outside

14

the Ammunition Depot with an AK-47, the first firearm he ever held. But he would not remain a security guard.

Not long after, a powerful mullah visited the depot and ordered Najib and ten other men aboard a tank heading northeast to Kapisa and then on to Panjshir province, the front lines of the Taliban's battle with the Northern Alliance. There, Najib first encountered warfare. When they reached Panjshir, they were attacked from all sides by guerrilla fighters, who spilled out from hiding places among villagers and homes. He watched a rocket propelled grenade ("RPG") hit and kill one of his commanders. He saw other young fighters captured and killed as others attempted to flee. Najib managed to escape with three other soldiers and led them in fighting their way through a treacherous Northern Alliance checkpoint. When they reached safety, Najib recalls feeling euphoric, having survived to return home to his wife and son.

Remembering his first battle as a young and impressionable adult, Najib notes: "It's hard to learn to be a soldier. You don't choose this—a situation that makes you get involved and then you are cornered. It's like if you put a cat in danger. If it knows the end of its life is near, the cat will fight like a lion. That's what happened to me."

### C. Najib attempts to leave the Taliban but rejoins under economic distress.

Between 1996 and 2001, the Taliban controlled the majority of Afghanistan. But with the U.S. invasion on October 7, 2001, following the terrorist attacks of

15

September 11, 2001, Afghanistan became a battlefield once again.[7] *Id.* at 60. At the start of the war, the Taliban had approximately 45,000 men, backed by approximately 2,700 foreign fighters and as many as 10,000 volunteers from Pakistan. *Id.* at 63. These numbers were no match for the force of the air and ground attacks mounted by the U.S. and U.S.-backed Northern Alliance. *Id.* at 65-66. By mid-November 2001, the Taliban had lost most of Afghanistan, and by December 6, the Taliban leader Mullah Omar had ordered a cessation to the resistance. *Id.* at 69, 75. The movement dispersed: Many high-ranking commanders escaped to Pakistan, followed by thousands of fighters and religious scholars. *Id.* at 75. Other Taliban members attempted to return to their homes in Afghanistan. *Id.* Approximately 15,000 had been killed or taken prisoner. *Id.* at 78.

As for Najib, when the invasion began, he tried to bring his family to safety in Zabul, their tribal homeland. On the way, however, their car came under fire. Najib's sister-in-law was killed, and Najib sustained a gunshot wound to his shoulder and leg injuries that impaired him for years. From Zabul, Najib immigrated to Saudi Arabia in search of a normal life with assistance from an uncle who helped him obtain a visa. Najib worked for his uncle in a gas station and as a driver.

---

[7] Malkasian notes that "[w]ar came to Afghanistan as an external shock. The Soviet-Afghan War, the later civil war, and finally Taliban rule fostered an environment in which extremism could grow. Twenty years of disorder and outside intervention contributed to the rise of terrorism. Afghans themselves, however, were not international terrorists. The September 11 plot may have been supervised from Afghanistan but it was dot Afghan." Malkasian, *American War*, at 53.

Any peace that Najib found in Saudi Arabia was short-lived. A couple years after he arrived, he returned home from making the pilgrimage to Mecca and was greeted by ten police officers. He was blindfolded, stripped, and taken hundreds of miles away for interrogation about the Taliban. He was also tortured: hung by his hands from a chain on the ceiling of a metal shipping container, heated by the July sun to about 55 degrees Celsius, or roughly 131 degrees Fahrenheit. When he was retrieved hours later, he was unconscious, his head blistered from the heat. He was then interrogated again and beaten for hours before being placed back into the container. This horrific cycle went on for about 20 days. He felt like he was losing his mind.[8] Finally, after 20 days, he was transferred to a jail with other detainees, where he was interrogated for another two months and then deported to Pakistan. From there, he sneaked back into Afghanistan to reunite with his family in Zabul.

For a time, Najib attempted to remain independent from the Taliban. He worked in agricultural fields, a retail store, and at a dealership importing used cars from Dubai. But he struggled to support his large family. Thus, in approximately 2004 or 2005, Najib and his brother Timor Shah reengaged with the Taliban.[9] Around the same time, Najib relocated his family to Karachi, Pakistan, where the

---

[8] This was not Najib's only encounter with torture. After he rejoined the Taliban around 2004/2005, he was jailed and tortured on multiple occasions, as recounted in connection with his motion to suppress statements.

[9] By 2005, numerous Taliban fighters had "infiltrated back into the [Afghan] countryside and reestablished old strongholds. Thousands of Afghans had decided to accept the Taliban. The United States, the new Afghan state, and tribal powerbrokers had mistreated former Taliban and tribes and poor communities that had formerly supported the Taliban, unleashing grievances that pushed them back into the arms of the movement. Until the end of 2005, the Taliban and their supporters had been too weak to overturn the government. That was about to change." Malkasian, *American War*, at 126-27.

Taliban helped place his children in schools and provided Najib with money to support them.

### III.    A downward variance is also necessary to account for Najibullah's relative status as a low-level Taliban commander in Wardak Province with limited influence who did not personally participate in the June 26, 2008, attack on a U.S. military convoy in the Tangi Valley.

In connection with sentencing, the defense asked Professor Michael Semple to prepare a report analyzing Najib's role within the Taliban movement and as a commander in Wardak Province between 2006 and 2009. *See* Exhibit A. Professor Semple is an expert on the political culture of the Afghan Taliban, former Deputy EU Special Representative in Afghanistan, and a visiting scholar at the Institute for Global Peace, Security, and Justice at Queen's University, Belfast. He was also actively involved in the negotiations to free ███████ in 2008 and 2009 and prepared a report about the kidnapping based on his personal knowledge and interviews with Mr. ████ and others, which was published on June 26, 2009, within a week of Mr. ████'s escape. *See* Exhibit B.

In his report about Najib's role as a commander, Professor Semple addresses Najib's return to the Taliban and his rise from a foot soldier to a low-level commander responsible for a few dozen men. The report also clarifies the extent of Najib's responsibility for violence in Wardak Province between 2006 and 2009 and gives context to his relatively low position within the Taliban's hierarchy in the province. Professor Semple explains that when Najib and his brother Timor Shah rejoined the Taliban in approximately 2004/2005, the pair linked up with Dadaullah Lang, who was organizing "the first phase of Taliban re-insertion into Afghanistan"

18

from Pakistan. Exhibit A at 14. Dadaullah Lang was "[o]ne of the key *mahaz* [front] commanders in the first three of four years of the [Taliban] insurgency." *Id.* at 11. As Professor Semple writes:

> His fighters were mainly from Urozgan, Zabul and other provinces of the South-West. In the pre-2001 campaigns, he established a reputation for being fearless and wild. During that period of Taliban rule, I documented serious war crimes, which Dadaullah and his men were accused of. The *Amir*, Mullah Omar, ordered Dadaullah disarmed more than once, for unacceptable behaviour. Remarkably, Dadaullah complied with those orders and was later reactivated. And, in the same period he was occasionally courteous and hospitable to some of my international peers in Kabul. Dadullah was killed in Afghanistan in 2007, which opened the question of the future of his *mahaz* and the men who had fought in it.

*Id.* at 11. At the time that Najib and Timor Shah joined Dadaullah's *mahaz*, they were very junior figures, "little above the rank of *mujahid*, or ordinary fighter." *Id.* at 15.

In 2006, during one of their missions into Afghanistan as a part of Dadaullah's *mahaz*, Najib and Timor Shah were arrested as they tried to enter Kabul. At this point, some of their family had returned to Kabul from Pakistan. The National Directorate of Security (NDS) in Afghanistan interrogated Najib and his brother and searched the family house. Exhibit A at 15. In response, Najib's other brothers moved their families back to Karachi, Pakistan, and worked to secure Najib and Timor Shah's release. Eventually, through bribery, Najib and Timor Shah were released from the infamous Pul-e-Charki prison on the outskirts of Kabul.[10]

---

[10] For a primer on Pul-e-Charki, *see* Auliya Atrafi and Claire Press, *Inside Block Six: The prison wing that holds 2,000 Taliban*, BBC (November 2019), available at: https://www.bbc.co.uk/news/extra/TR5x1ptlpv/inside-block-six.

By the time Najib and Timor Shah emerged from prison in the summer of 2007, Dadaullah Lang had been assassinated, and Najib expressed interest in taking over Dadaullah's *mahaz*. *Id.* He was not successful; control of the *mahaz* fell to Dadaullah's brother, Mansoor, instead. *Id.* Without Dadaullah, Najib's "commander and patron," Najib "required a new position within the Taliban." *Id.*

The acting general commander at the time, Mullah Baradar, decided to deploy Najib to Jaghatu District in Wardak Province, where Najib's family had some roots, "to command a group of fighters in his own right." *Id.* This appointment gave Najib the official status he desired. But it also caused friction with the existing Taliban infrastructure in Wardak Province. As Professor Semple writes:

> Najeeb was thus accorded nominal, but nevertheless official, status in the *tashkeel*. But because he was appointed directly from the centre, rather than being nominated by the relevant *wali*, it created the possibility of tensions which did indeed soon emerge. Baradar, while sending Najeeb, made it clear that the choice of assignment was so that Najeeb could invoke his tribal ties to Jaghatu. The two main Pashtun tribes of Wardak are Mayar and Noori. Najeeb's family belongs to the Noori and, within this, the Adinkhel. Jaghatu was the family's ancestral home and territory of the Adinkhel. But the family only owns about one and a half hectares in Jaghatu.

*Id.* at 15.

Najib arrived in Jaghatu District around the same time that another Taliban leader was appointed as *wali* in Wardak—Mawlvi Taha, presently the Deputy Minister of Borders and Tribal Affairs in Afghanistan. *Id.* at 11. Taha was a "key figure" in the Taliban's shadow administration over Wardak between 2006 and 2009. As Professor Semple writes:

> The key figure in the Taliban shadow administration in Wardak during 2006-2009 was Mawlvi Taha, the wali. He was appointed over the head

of a local Taliban figure, Mawlvi Qadeem, who had started the process of rebuilding the Taliban. In terms of tribe, Mawlvi Taha was a Zadran Pashtun, from the border province of Paktika. He had served as Paktika wali before the 2001 collapse. Prior to his appointment to Paktika, Mawlvi Taha was in charge of the Peshawar branch of the military commission, one of the six seniormost positions in the Taliban's hierarchy. The appointment of a senior veteran such as Taha to Wardak probably signalled that the leadership considered the province strategically important. Taha survived the insurgency and, confirming his status as a senior figure, he serves the current Taliban government as Deputy Minister for Frontiers and Tribal Affairs.

*Id.*

By the time Mullah Baradar appointed Najib to his position in Jaghatu, Mawlvi Taha had already appointed or nominated the rest of his shadow administration and was offended by Mullah Baradar's infringement on his authority. *Id.* at 16-17. As a result, Najib and Taha had a strained relationship, and Taha sought to limit Najib's personal influence and activities to Jaghatu district. *Id.* at 17-18. This dynamic between Najib and Mawlvi Taha provides important context for understanding Najib's role as a commander in Wardak and how he contributed to the June 26, 2008, convoy attack in the Tangi Valley, Sayedabad District, Wardak Province.

Regarding Najib's role as a commander, he was "greatly outranked by the Wardak Wali Mawlvi Taha," and his activities were largely confined to Jaghatu District and an adjacent 28km stretch of highway in south-western Wardak. *Id.* at 19, 21. Najib never numbered "among the prominent and influential Taliban leaders and commanders" and was instead an "ambitious self-publicist, apt to inflate his own role and significance." *Id.* at 19. Notably, this assessment of Najib's limited influence is consistent with Professor Semple's description of Najib in his

21

June 26, 2009, report about the ███ kidnapping as a person with "no particular status within the [Taliban] movement—he was just another anonymous local commander who could count on the loyalty of a handful of gunmen. And yet he was confident that he was more intelligent than figures occupying high positions in the insurgency." Exhibit B at USAO_4138.

Regarding the June 26, 2008, attack in the Tangi Valley, Professor Semple rejects the notion that Najib was, or even could have been, a personal participant. Exhibit A at 19, 21. Instead, the individual Taha appointed to be "personally responsible for the Tangi area"—a commander named Fazl Rabi (also spelled Fasil, Fazil, or Fazel)—was the "planner of the ambush and personally led the group of fighters involved…." *Id.* at 19, 20. Professor Semple's conclusion is corroborated by video proof he obtained in connection with his research and open-source reporting, including from National Public Radio's Steve Inskeep, which recognized Rabi's role as a commander over the Tangi Valley.[11] As Professor Semple writes:

> Based on his operating protocol and difficult relationship with *wali* Taha, Haji Najeeb was unlikely in a position to personally perpetrate attacks on US forces in the Syedabad-Sheikhabad and Tangi area in 2008. These locations were physically distant from Najeeb's rear base in Jaghatu. Najeeb also had strained relations with the Taliban officials responsible for the Sheikhabad and Tangi areas, and could not count on their cooperation, including from other Taliban group commanders based and operating in the Syedabad-Sheikhabad and Tangi areas.

---

[11] *See* Steve Inskeep, Taylor Haney, Fazelminallah Qazizai, Arezou Rezvani, *Afghans in a battle-scarred valley welcomed Taliban rule, but expect more*, NPR (August 15, 2022, 3:28 PM ET), available at: https://www.npr.org/2022/08/15/1117498433/afghanistan-rural-wardak-tangi-valley-taliban. *See also* Steve Inskeep, *What did Afghans gain—and lose—in a region that supported the Taliban?*, NPR (August 15, 2022, 5:13 AM ET), available at: https://www.npr.org/2022/08/15/1117484455/former-taliban-fighters-are-waiting-for-the-de-facto-government-to-rebuild.

Exhibit A at 19.

Najib's lack of personal involvement in the June 26, 2008, attack is significant because it mitigates his overall culpability for the incident itself and its gruesome aftermath—namely the soldiers' post-mortem mutilation by Fazl Rabi, to which Inskeep's reporting alludes. *See also, e.g.*, Carlotta Gall, *Insurgency's Scars Line Afghanistan's Main Road*, N.Y. Times (August 13, 2008) (reporting on the details of the June 26, 2008, convoy attack in the Tangi Valley).[12] The defense does not contest that Najib's material support as a commander contributed to the convoy attack and resulted in the deaths of four people. But it would be unfair and a miscarriage of justice to sentence him as if he specifically intended, planned, and conducted the operation. Indeed, under Second Circuit precedent, "a 'death results' element requires only but-for causation, meaning that the Government need only prove that 'but for' the defendant's actions in committing the charged crime, the death would not have occurred. Under this test, the death of the victim need not be foreseeable to the defendant and certainly need not be the defendant's desired or intended outcome." *United States v. Mangione*, 818 F. Supp. 3d 509, 533 (S.D.N.Y. 2026) (citing *United States v. Felder*, 993 F.3d 57, 70 (2d Cir. 2021) (death results penalty provision in carjacking statute); *United States v. Harden*, 893 F.3d 434, 447-48 (7th Cir. 2018) (observing that every federal court of appeals to address the issue has held that proximate cause is not required for the "death results" element of unlawful distribution of a controlled substance)).

---

[12] Available at: https://www.nytimes.com/2008/08/14/world/asia/14highway.html.

With this context in mind, an 18-year-long sentence would properly reflect the significance of Najib's role in the Taliban and his connection to the June 26, 2008, attack. Najib was *not* a prolific or well-known commander personally responsible for an entire province or hundreds of fighters. Rather, he was a striving but somewhat irrelevant local commander who operated within a discrete territory and whose activities allowed Mawlvi Taha to redirect resources and fighters, including those under Najib's command, to operations throughout Wardak Province. As Professor Semple concludes:

> By primarily operating militarily in Jaghatu and the south-west stretch of highway, Haji Najeeb maintained the Taliban presence in a significant part of the province. This enabled the overall commander, *wali* Taha, to devote more fighters and resources to the strategically important areas in the north and north-east of the province, including Sayedabad – the gateway to Kabul and the back road to Pakistan through Tangi. Accordingly, given the fungibility of the fighters and resources involved, Haji Najeeb's material support to the Taliban as a local commander in Jaghatu contributed to the insurgency attacks that occurred in Sayedabad and the Tangi Valley.

Exhibit A at 21.

**IV.   A downward variance is also appropriate because Najib is the only native Afghan Pashtun prosecuted in federal court for crimes committed during the American war in Afghanistan, and he is far less culpable than other Taliban leaders the United States has declined to pursue and prosecute.**

Najib's personal and offense-related mitigation, addressed here and in the defense's classified submission, merits a substantial variance from the guidelines. But sentencing Najib to life or to a term of years effectively constituting life would also violate 18 U.S.C. § 3553(a)(6), which instructs courts to avoid sentences that create unwarranted disparities in outcomes among similarly situated individuals.

Despite Najib's diminished significance within the Taliban, he is the only native Afghan to face prosecution in United States federal court for crimes related to his membership in the group, which now rules Afghanistan. In fact, as a result of the Doha Accord (a formal treaty between the United States and the Taliban from February 2020), terrorists who are much more notorious than Najib and were personally responsible for some of the most heinous attacks on civilians and U.S. military personnel in Afghanistan, live freely, maintain high-ranking government positions, and even enjoy some diplomatic relations with the United States. A variance is therefore necessary to account for the United States government's decision to abandon its pursuit of far more culpable Taliban leaders and, in effect, grant them a blanket *nolle prosequi*.

The government's decision to abandon its pursuit of Sirajuddin Haqqani, the current Interior Minister of Afghanistan, is particularly illustrative. For years, Sirajuddin led the Haqqani Network, a ruthless and powerful terrorist group founded by his father, Jalaluddin Haqqani, that operated alongside the Taliban during its insurgency and coordinated numerous suicide bombings and kidnappings of foreigners throughout Afghanistan. According to the National Counterterrorism Center (NCTC):

> The Haqqani Network is responsible for some of the highest-profile attacks of the Afghan war, including the June 2011 assault on the Kabul Intercontinental Hotel, conducted jointly with the Afghan Taliban, and two major suicide bombings—in 2008 and 2009—against the Indian Embassy in Kabul. In September 2011, the Haqqanis participated in a day-long assault against major targets in Kabul, including the US Embassy, International Security Assistance Force (ISAF) headquarters, the Afghan Presidential Palace, and the Afghan National Directorate of

Security headquarters. More recently, in October 2013, Afghan security forces intercepted a truck bomb deployed by the Haqqanis against Forward Operating Base Goode in Paktiya Province. The device, which did not detonate, contained some 61,500 pounds of explosives and was the largest truck bomb ever built. The group is also involved in a number of criminal activities in Afghanistan and Pakistan, including extortion, kidnapping for ransom, and smuggling.[13]

Sirajuddin is so infamous that the United States once imposed a $10 million bounty on his head for, *inter alia*, conducting an attack on a hotel in Kabul in January 2008 that killed six people, including an American citizen. He was also wanted for trying to assassinate former Afghan President Hamid Karzai in 2008 and for conducting numerous attacks against U.S. soldiers and Coalition Forces, many resulting in death. Moreover, as leader of the Haqqani Network, Sirajuddin directly oversaw and played an aggravating role in the ███ kidnapping.

But today, the United States has abandoned its pursuit of Sirajuddin entirely, removing its $10 million bounty from the State Department's Rewards for Justice Program and from Sirajuddin's FBI Wanted Poster Index.[14] That the United States has effectively given Sirajuddin Haqqani a free pass makes it impossible to simultaneously justify throwing the proverbial book at Najib through a life sentence or a term of years amounting to the rest of his life.

---

[13] Available at: https://www.dni.gov/nctc/groups/haqqani_network.html.

[14] *See* Yogita Limaye, *US drops bounties on key Taliban leaders*, BBC (March 25, 2025), available at: https://www.bbc.com/news/articles/c1enxv4vz7do.

### A. Sirajuddin Haqqani played an aggravating, management role in ███████████ kidnapping.

The kidnapping of Mr. ██████ relied heavily on connections across the Haqqani Network and would not have been possible without Sirajuddin's support and management. Throughout Mr. ██████'s captivity, Sirajuddin "maintained a degree of control" over the kidnapping through Sherif Mangal, his chief liaison. Exhibit B at USAO_4140. Sherif's house in northern Miram Shah served as the longest continuous holding location for ██████████ and the other kidnapping victims. *Id.* at USAO_4135. Sirajuddin also exerted control over the kidnapping through his brother, Badruddin Haqqani, who was unindicted co-conspirator-1 in the original indictment against Najib.

In his role as leader of the Haqqani Network, Sirajuddin was also kept apprised of the kidnapping's progress at every step, and he held authority over the men who executed the operation. *Id.* at USAO_4142. Sirajuddin also held full and exclusive authority to sign off on any deal relating to an exchange of the kidnapping victims for Taliban prisoners. *Id.* And upon kidnapping Mr. ██████ and his companions, the hostage-takers quickly shifted towards Haqqani Network territory to leverage Sirajuddin's control within the region. Funding for the operation was also doled out by Sirajuddin through Badruddin. *Id.* at USAO_4143.

The scope of the kidnapping also necessitated Sirajuddin's oversight and support. The operation utilized at least four Haqqani Network affiliates to house the hostages in six separate locations, accounting for at least half of the total locations used by the kidnappers. *Id.* at USAO_4132-4136. Indeed, the hostages

27

spent a significant portion of their time in captivity in or around Miram Shah, North Waziristan—Sirajuddin's stronghold. *Id.* at 4135, 4142. Keeping the hostages within Haqqani territory served to isolate them from other Taliban factions and helped Sirajuddin exercise control.

Notably, in the book Mr. ██████ wrote with his wife ██████████████ about their ordeal during the kidnapping, Ms. ████████ recounts some of her interactions with Professor Semple (who was advising on hostage negotiations) and her security team, who all agreed that Sirajuddin was the person "ultimately in charge of David's fate." ████ ██████ and ██████████, ██████████ ████████████ ██████████.[15] And of course, the Haqqani Network's responsibility for Mr. ████████ kidnapping is further illustrated by their months-long detention and torture of Timor Shah after Mr. ████████ escaped. The Haqqanis' grudge against Timor Shah and Najib persisted well beyond their release of Timor Shah, however, and culminated in an attack on him and Najib in June 2014, during which Timor Shah was killed.[16]

---

[15] Despite his notoriety and role in Mr. ████████'s hostage taking, the *New York Times*, who formerly employed Mr. ████████, interviewed Sirajuddin in October 2024 and published what can only be described as a "puff piece," full of flattering pictures of Sirajuddin and allusions to his desire to transform himself from a terrorist into a negotiator and diplomat. Shockingly, it does not appear that the reporter ever questioned Sirajuddin about his role in Mr. ████████ kidnapping. *See* Christina Goldbaum, *Is Afghanistan's Most-Wanted Militant Now Its Best Hope for Change?*, N.Y. Times (October 24, 2024), available at: https://www.nytimes.com/2024/10/24/world/asia/afghanistan-sirajuddin-haqqani-taliban.html.

[16]

## B. Sirajuddin Haqqani was involved in numerous other kidnappings, suicide bombings, and other deadly attacks.

As noted above, Sirajuddin was a most-wanted terrorist for years, subject to a $10 million bounty by the State Department and FBI.[17] While the government bounty is no longer in place, the government accused Sirajuddin of perpetrating a January 2008 attack on a hotel in Kabul, Afghanistan, cross-border attacks against the United States and Coalition Forces in Afghanistan, and the planning of the attempted assassination of former Afghan President Hamid Karzai in 2008.[18]

On January 14, 2008, the Kabul Serena Hotel was attacked by a group of four men armed with AK-47 automatic rifles, hand grenades, and explosive jackets. The fighters were working under Sirajuddin Haqqani.[19] Six people, including an



---

[17] *The US lifts bounties on senior Taliban officials, including Sirajuddin Haqqani, says Kabul*, Associated Press, (March 23, 2025), available at: https://apnews.com/article/afghanistan-taliban-haqqani-us-bounty-a9f5434850d78f15f81f72222c14b894.

[18] *Seeking Information – Terrorism*, Fed. Bureau of Investigation, available at: https://www.fbi.gov/wanted/terrorinfo.

[19] Carlotta Gall, *Old-line Taliban commander is face of rising Afghan threat*, N.Y. Times, (June 17, 2008), https://www.nytimes.com/2008/06/17/world/asia/17iht-17warlord.13756827.html.

American citizen, were killed in the attack. And during Sirajuddin's assassination

attempt on former President Karzai, three people were killed. The attackers,

operating at Sirajuddin's direction, shot into a crowd of people gathered for a parade

celebrating Afghanistan's liberation from the Soviets, including with rocket-

propelled grenades.[20]

In addition to the specific events highlighted by the FBI in its former pursuit

of Sirajuddin, the Haqqani Network planned and carried out numerous other

horrific acts of terrorism across the region under Sirajuddin's leadership. For

example:

- Sirajuddin was involved in planning a suicide bombing in Kabul on June 18, 2007, targeting a bus carrying police officers.[21] The bombing killed 35 police officers. The suicide bomber entered the police bus on its morning route to the academy.[22] Upon detonating his suicide vest, the resulting blast was so forceful that it tore the roof off the bus, ripped apart two nearby vehicles, and sent shrapnel of metal and glass shooting around the densely packed Kabul street. The shrapnel injured pedestrians on all sides, including at a nearby bus terminal.

- On July 7, 2008, the Indian Embassy in Kabul was attacked by a car bomb, resulting in the deaths of 58 people. That morning, the attacker drove a car filled with explosives up to the gate of the Indian Embassy before detonating.[23] Much like the previous bus bombing, the timing of the bombing allowed the attacker to kill and maim as many people as possible. The embassy gate was an entrance for cars and was where

---

[20] *Sirajuddin Haqqani*, FBI, https://www.fbi.gov/wanted/terrorinfo/sirajuddin-haqqani.

[21] *Sirajuddin Jallaloudine Haqqani*, U.N. Sec. Council, (Sept. 13, 2007) https://main.un.org/securitycouncil/en/sanctions/1988/materials/summaries/individual/sirajuddin-jallaloudine-haqqani.

[22] Barry Bearak, *After Bus Attack, Afghan Police Mourn Their Own*, N.Y. Times, (June 18, 2007), https://www.nytimes.com/2007/06/18/world/asia/18afghan.html.

[23] Abdul Haleem and Lin Jing, *Militants mounting pressure to destabilize Afghan gov't*, Xinhua Net, (July 7, 2008), https://web.archive.org/web/20121021060925/http://news.xinhuanet.com/english/2008-07/07/content_8506817.htm.

people would line up to receive visas. This attack was later attributed to the Haqqani Network under Sirajuddin's leadership.[24]

- In another attack attributed to the Haqqani Network under Sirajuddin, Camp Chapman, a CIA outpost, was attacked by a suicide bomb on December 30, 2009. The informant, who previously worked alongside the CIA, was able to enter the camp with little resistance from the officers there. Once inside the perimeter, the informant detonated the suicide bomb. The attack resulted in the deaths of nine people, including seven CIA officers and contractors, and an officer of Jordan's intelligence service.[25]

- On June 30, 2009, Bowe Bergdahl was kidnapped by militants associated with the Haqqani network.[26] He was held for nearly five years until a prisoner swap on May 31, 2014, brokered his return. While the circumstances surrounding his disappearance are disputed, his status as a hostage within the Haqqani Network was established by U.S. intelligence.[27]

- The Haqqani Network orchestrated another suicide bombing in Kabul on May 18, 2010, resulting in the deaths of 18, including 6 coalition soldiers.[28] Among the coalition soldiers, a U.S. Colonel, Lieutenant Colonel, and two U.S. soldiers of unidentified rank were killed. The attack involved a minibus filled with explosives, operated by a suicide bomber, that rammed into an American convoy before detonating in rush-hour traffic. Like the other suicide bombings carried out by the Haqqani Network, this bomb detonated in a densely populated area, injuring as many civilians as possible.

---

[24] Mark Mazzetti and Eric Schmitt, *Pakistanis Aided Attack in Kabul, U.S. Officials Say*, N.Y. Times, (August 1, 2008) https://www.nytimes.com/2008/08/01/world/asia/01pstan.html.

[25] Joby Warrick, *Did Pakistan secretly fund an attack on CIA officers in 2009? Memo makes controversial claim.*, The Washington Post, (April 15, 2016), https://www.washingtonpost.com/news/worldviews/wp/2016/04/15/did-pakistan-secretly-fund-an-attack-on-cia-officers-in-2009-memo-makes-controversial-claim/.

[26] Declan Walsh, *Taliban release video of captured US soldier*, The Guardian, (July 29, 2009), https://www.theguardian.com/world/2009/jul/19/afghanistan-captured-american-soldier-video.

[27] Liz Fields, *Bowe Bergdahl: I Was Tortured, Shackled, and Caged in Taliban Captivity*, Vice, (March 26, 2015), https://www.vice.com/en/article/bowe-bergdahl-i-was-tortured-shackled-and-caged-in-taliban-captivity/.

[28] Dexter Filkins, *Taliban Car Bomb Strikes U.S. Convoy in Kabul*, N.Y. Times, (May 18, 2010), https://www.nytimes.com/2010/05/19/world/asia/19afghan.html.

- On June 28, 2011, a group of nine gunmen and suicide bombers attacked the Inter-Continental Hotel in Kabul, resulting in the deaths of 21 people.[29] Some of the attackers detonated their bombs in key locations, including the main entrance to the hotel. The gunmen walked through halls firing at guests. Reporting indicates that the gunmen searched through rooms to find more civilians to murder. The six-hour siege ended only when NATO helicopters killed the attackers positioned on the hotel's roof. The International Security Assistance Force (ISAF) attributed responsibility to the Haqqani Network and carried out airstrikes against the Network in retaliation. [30]

- The Haqqani Network under Sirajuddin participated in two separate attacks to mark the 10-year anniversary of the September 11th terrorist attacks. On September 10, 2011, a truck bomb exploded outside of Combat Outpost Sayed Abad killing five Afghans and wounding 77 U.S. soldiers.[31] The massive blast from the truck damaged about 100 shops in a nearby bazaar.[32] A three-year-old girl was among those killed in the blast. Following the bombing, Haqqani affiliated insurgents conducted a 19-hour siege of the American Embassy and NATO headquarters in Kabul, resulting in the deaths of 16 people, including at least 6 children.[33] The attackers utilized an unfinished high-rise building near the Embassy compound to fire rocket-propelled grenades and spray bullets at the crowd, while suicide bombers hit targets elsewhere in the city. Both assaults symbolize the priorities of Haqqani Network attacks: any attack should target institutions and lead to as many casualties as possible, including civilians.

---

[29] Alissa J. Rubin, *Attack at Kabul Hotel Deflates Security Hopes in Afghanistan*, N.Y. Times, (Jun. 29, 2011), https://www.nytimes.com/2011/06/30/world/asia/30afghanistan.html?_r=1&hp.

[30] Bill Roggio, *ISAF airstrike kills senior Haqqani Network commander involved in Kabul hotel attack*, Long War Journal, (Jun. 30, 2011), https://www.longwarjournal.org/archives/2011/06/isaf_airstrike_kills.php.

[31] Pauline Jelinek, *Haqqani group behind Afghan bombing, U.S. says*, ArmyTimes, (September 12, 2011), https://archive.today/20120717175624/http://www.armytimes.com/news/2011/09/ap-afghanistan-us-says-haqqani-behind-bombing-091211/.

[32] *77 Americans wounded in Afghan truck bombing*, CBS News, (Sep. 11, 2011, 2:06 PM), https://www.cbsnews.com/news/77-americans-wounded-in-afghan-truck-bombing/.

[33] Jack Healy and Alissa J. Rubin, *U.S. Blames Pakistan-Based Group for Attack on Embassy in Kabul*, N.Y. Times, (Sep. 14, 2011), https://www.nytimes.com/2011/09/15/world/asia/us-blames-kabul-assault-on-pakistan-based-group.html.

- On May 30, 2017, the Haqqani Network perpetrated the deadliest terror attack in Kabul when a truck bomb exploded in a crowded intersection.[34] Initial reporting indicated that at least 90 people were killed and over 400 wounded, but it was later determined that the blast killed 150 people.[35] The bomb ripped through the busy neighborhood on Wednesday morning, inflicting maximum civilian damage. The area also contained multiple diplomatic missions, damaging the German, French, Turkish, Iranian, and Japanese Embassy buildings. The Afghan NDS linked the attack to the Haqqani Network.

- In another attack on the Inter-Continental Hotel, the Haqqani Network laid siege for 14 hours on January 21, 2018.[36] The attack was carried out by six assailants armed with explosives and automatic weapons, resulting in the death of 43 people. Like the previous Inter-Continental Hotel assault, attackers swept through the hotel, opening fire on any guest they could find. Afghan officials tied the attack to the Haqqani Network.

- On January 27, 2018, an ambulance full of explosives was detonated in Kabul, killing 103 people.[37] The attackers used the ambulance to pass at least one security checkpoint at a hospital in Kabul. While stopped at a second checkpoint, the attacker detonated the explosives. The ambulance was close to several buildings, including Jamhuriat hospital. The attack was particularly deadly because the area is normally crowded on Saturdays, providing the maximum amount of harm for an attack of this scale. U.S. officials tied the attack to the Haqqani network.

---

[34] Ayaz Gul, *Afghan Capital Rocked by Deadly Bomb Attack*, Voice of America News, (May 31, 2017), https://www.voanews.com/a/massive-car-bomb-in-kabul/3878752.html.

[35] Phil Stewart and Michelle Nichols, *U.S. sees Haqqani network behind ambulance bombing in Kabul*, Reuters, (Jan. 29, 2018, 6:01 PM), https://www.reuters.com/article/us-afghanistan-blast-usa-haqqani-idUSKBN1FI2L0/.

[36] Mujib Mashal and Fatima Faizi, *Siege at Kabul Hotel Caps a Violent 24 Hours in Afghanistan*, N.Y. Times, (Jan. 21, 2018), https://www.nytimes.com/2018/01/21/world/asia/afghanistan-hotel-attack.html.

[37] Phil Stewart and Michelle Nichols, *U.S. sees Haqqani network behind ambulance bombing in Kabul*, Reuters, (Jan. 29, 2018, 6:01 PM), https://www.reuters.com/article/us-afghanistan-blast-usa-haqqani-idUSKBN1FI2L0/.

Sirajuddin Haqqani remained reclusive while American troops were present in Afghanistan. Following the U.S. military's full withdrawal, however, on August 30, 2021, he appeared for a speech on October 19, 2021, at the Inter-Continental Hotel in Kabul[38]—the same hotel that Sirajuddin previously targeted. The event hosted the families and heirs of suicide bombers tied to the Taliban and al-Qaeda, many of whom were used by the Haqqani Network to target Coalition Forces. In his speech, Sirajuddin praised the use of suicide bombers to target the U.S. and its allies, stating these tactics resulted in the Taliban regaining political power in Afghanistan. He also recounted a June 2003 attack, facilitated by the Haqqani Network under his leadership, that killed at least four German soldiers.[39]

### C. Despite his well-documented history of murderous terrorism against United States persons and allies, Sirajuddin Haqqani is no longer pursued and enjoys a comfortable and secure lifestyle.

The government's decision to abandon its pursuit of Sirajuddin and his $10 million bounty marks another moment of warming relations between the United States and the Taliban that militates against a life sentence for Najib. With his freedom, Sirajuddin enjoys a high-ranking position within the Afghan government and is even able to travel internationally for business and pleasure.

---

[38] Abdul Sayed, *The Haqqani Network's Martyr: Inside Afghan Taliban Interior Minister Sirajuddin Haqqani's Reception Honoring Suicide Bombers*, Jamestown, (Nov. 05, 2021), https://jamestown.org/inside-afghan-taliban-interior-minister-sirajuddin-haqqanis-reception-honoring-suicide-bombers/.

[39] Carlotta Gall, *THREATS AND RESPONSES: AFGHANISTAN; Kabul Bombing Kills 4 German Soldiers and Wounds 29*, N.Y. Times, (June 8, 2003), https://www.nytimes.com/2003/06/08/world/threats-responses-afghanistan-kabul-bombing-kills-4-german-soldiers-wounds-29.html.

For example, in June 2024, even before the U.S. government had officially dropped its bounty against him, Sirajuddin flexed his diplomatic muscle by visiting the United Arab Emirates and performing a religious pilgrimage to Saudi.[40] Sirajuddin boldly videotaped his entire trip to Mecca, where he was given a hero's welcome by a group of supporters. A few months later, the United Nations Security Council's 1988 Sanctions Committee approved a travel ban exemption for Sirajuddin to facilitate additional travel to Mecca and elsewhere.[41]



*Sirajuddin in Mecca*

Today, Sirajuddin now serves as First Deputy Leader and Interior Minister of



*Sirajuddin's meeting with UN Under-Secretary Gilles Michaud in 2024*

the Islamic Emirate of Afghanistan, the government run by the Taliban. In this role, Sirajuddin is heir to the position of Supreme Leader within the Emirate. Without

---

[40] Will Selber, *Analysis: Taliban leader Sirajuddin Haqqani becomes a statesman*, Long War Journal, (June 12, 2024), https://www.longwarjournal.org/archives/2024/06/analysis-taliban-leader-sirajuddin-haqqani-becomes-a-statesman.php.

[41] *UNSC Discloses Travel Exemptions for 3 Islamic Emirate Officials*, Tolqun News, (February 5, 2025), https://tolqunnews.com/2025/02/05/unsc-discloses-travel-exemptions-for-3-islamic-emirate-officials/.

the bounty from the FBI, Sirajuddin is only bound by the United Nations 1988 Sanctions Committee, which requires "all states… to prevent the entry into or transit through their territories by designated individuals."[42]



*Sirajuddin's April 2026 meeting with China's ambassador to Kabul*

Despite this obligation, Sirajuddin continues to travel throughout the Arabian Peninsula and elsewhere without fear of arrest.

As one of the highest-ranking members of the Taliban and the Haqqani Network, Sirajuddin once was one of the most feared men in the world. Yet even after playing an oversight role in ▇▇▇▇▇▇'s kidnapping and facilitating some of the deadliest attacks during the war, he has avoided criminal charges, been removed from the FBI's most wanted list, and ascended to the highest echelons of the Afghan government. Meanwhile, Najib, a low-ranking Taliban commander of far less prominence, is the only native Afghan Taliban member who has been brought to justice in the United States, where he has spent the last six years in brutal federal jails, isolated from his family. Najib's conduct was serious and reprehensible. But given the unpunished actions of higher-ranking Taliban leaders responsible for the worst atrocities in the war, such as Sirajuddin Haqqani, a

---

[42] *Security Council Committee established pursuant to resolution 1988 (2011)*, UN Security Council, https://main.un.org/securitycouncil/en/sanctions/1988.

sentence above 18 years would be greater than necessary to adequately punish

Najib and promote respect for the law and would create an unwarranted disparity.

> **V.**    **A variance is also appropriate given Najib's receipt and non-disclosure of Top Secret/Sensitive Compartmented Information in connection with this case, which not only illustrates his trustworthiness, but also reinforces his right to be present at all aspects of sentencing.**

Between approximately February 1, 2021, and March 13, 2023, the

government made several productions of classified discovery, some of which was

marked Top Secret/Sensitive Compartmented Information ("TS/SCI"). Pursuant to

the classified discovery protective order that was entered, the government also

marked each page of classified discovery as shareable with Najib. As authorized by

the government, and over the course of two years, the defense shared the classified

discovery with Najib inside of a courthouse Sensitive Compartmented Information

Facility ("SCIF") and regularly brought him back to the SCIF to discuss classified

information and its relationship to his case.

Following the March 2023 classified production, the Court held oral

argument on a motion to compel that the defense had filed. In advance of that

argument, the parties disagreed over whether Najib should be produced. In

particular, the government claimed that it had marked the classified discovery

productions as shareable with Najib erroneously and sought to "claw back" his

access. The Court, while recognizing that it had limited authority to tell the

Executive Branch what to do with materials it deemed classified, nevertheless

granted Najib continued access to the classified discovery while he was

contemplating a potential plea offer.

At no point did Najib do anything untoward with the TS/SCI information to which he had access. Other than with his attorneys, who possess the requisite security clearance to receive classified discovery, he never shared or discussed the materials with anyone or tried to use them for any purpose, except to make arguments pertinent to his case through his counsel and the appropriate channels.

If Najib were a hardened and remorseless terrorist hellbent on damaging America—like Probation essentially claims in recommending a life sentence—then he would have almost certainly tried to use his unprecedented access to top secret information to obtain some other sort of nefarious advantage in his case. But Najib has never done anything inappropriate with his access to and awareness of classified information. To the contrary, he honored his obligation to keep the information a secret—a responsibility he took seriously out of respect for himself, his attorneys, and the judicial process—which undermines the argument that he deserves to spend the rest of his natural life in prison.

Relatedly, the fact that Najib is already privy to the classified information produced in this case also weighs strongly in favor of allowing him to be present for the classified portion of his sentencing hearing, at which the Court will address arguments that the defense advanced through its classified sentencing submission.

The Constitution guarantees a criminal defendant the right to be present at sentencing. *United States v. Salim*, 690 F.3d 115, 122 (2d Cir. 2012); *United States v. DeMott*, 513 F.3d 55, 58 (2d Cir. 2008). "Th[is] constitutional right … is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, but … is [also]

38

protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (cleaned up). In addition to the Constitution, a defendant has a statutory right to be present at sentence. Fed. R. Crim. P. 43(a)(3). Indeed, in codifying Rule 43, "Congress explicitly intended to codify existing law concerning an accused's constitutional and common law rights of presence at trial." *United States v. Reiter*, 897 F.2d 639, 642 (2d Cir. 1990).

Notwithstanding this context, the defense acknowledges that "[t]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Gagnon,* 470 U.S. at 526 (cleaned up). Accordingly, the defense is aware that the Second Circuit has upheld a defendant's exclusion from a critical stage of his trial proceedings at which classified information was discussed. *See In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 130 (2d Cir. 2008). But in that case, the Second Circuit upheld the defendant's exclusion based on specific factual findings, namely (1) that the defendant's exclusion was necessary to protect the lives of others; (2) that the defendant's relationship to Osama Bin Laden suggested that his "ability to keep the classified information at issue confidential was highly suspect— rendering it necessary to exclude him from proceedings where classified information would be discussed"; and (3) that the matters to be discussed at the classified proceedings bore no relationship at all to the defendant's guilt or innocence. *Id.*

39

In this case, none of these factors are present. First, unlike the defendant in the embassy bombings case, the government previously granted Najib access to the classified information at issue. Although it later revoked that access, Najib's receipt of the information did not jeopardize anyone's life. The Court can therefore be extremely confident that Najib's presence at the classified portion of his sentencing hearing would also not jeopardize public safety.

Second, unlike the defendant in the embassy bombings case, there is no reason to believe that Najib would ever divulge the classified information at issue. To the contrary, he has an indisputably clean track record of keeping the very same classified information confidential, and he will continue to do so. Third, for the reasons set forth in the defense's classified sentencing submission, the classified information at issue bears directly on an appropriate sentence. Restricting Najib's access to a classified sentencing proceeding would mean excluding him from participating in a critical stage of his case that is highly relevant to the Court's determination of a sufficient punishment, in violation of his due process right.

Accordingly, given the unique circumstances of this case and Najib's prior, years-long access to the classified information at issue, the Court should allow him to participate in the classified portion of his sentencing hearing.

## VI.    A variance is also necessary to account for unduly harsh and excessively punitive pre-trial confinement conditions.

Najib was extradited to the United States in October 2020, right in the middle of the COVID-19 pandemic. For the first several months of his pre-trial detention, he was detained at MCC New York. When that facility was shuttered

40

following Jeffrey Epstein's suicide, he was transferred to MDC Brooklyn. A significant variance is required to account for the excessively harsh conditions of Najib's pre-trial detention at both facilities.

Even in "normal" times, courts in this District have acknowledged that "it is no small thing to deprive a person of his or her freedom" because prison "is a harsh environment, in which fear and misery are never far from the surface, boredom is endemic, and privacy is nil." *United States v. Sayoc*, 388 F. Supp. 3d 300, 301 (S.D.N.Y. 2019). But Najib has not been detained during "normal" times. During his nearly six years of confinement, he has endured inhumane conditions stemming from chronic understaffing and years of mismanagement at MCC New York and MDC Brooklyn, and the Bureau of Prisons' bungled response to the COVID-19 pandemic. Indeed, numerous courts in this District have recognized that the overly harsh conditions at MCC and MDC over the last six years have made confinement in those facilities far more punishing than it should be. *See, e.g.*, *United States v. Barreto*, No. 19 Cr. 909 (KPF) (S.D.N.Y. June 27, 2023), Dkt. No. 72, Tr. 57:7-12 (noting that conditions of pretrial detention at MCC and MDC between 2020 and 2023 were "worse" and "harder … than they should be" and were a basis for a downward variance); *United States v. Tontisabo*, No. 21 Cr. 701 (LAK) (S.D.N.Y. Jan. 3, 2024), Dkt. No. 77, Tr. 39:16-40:1) ("Serving time over the past few years [in the MDC] has been horrible. … A sentence of a year in [the MDC] today, although it's very hard to quantify, is ever so much worse than it would have been five years ago."). Such conditions are grounds for a variance. *See United States v. Phillibert*,

41

No. 15 Cr. 647 (PAE), 2021 WL 3855894, at *4 (S.D.N.Y. Aug. 27, 2021) ("Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring a just sentence." (citing, *inter alia*, *United States v. Carty*, 264 F.3d 191, 196-97 (2d Cir. 2001) (holding that that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," and vacating and remanding the defendant's sentence "so that the district court [could] reconsider the defendant's request for a downward departure"))).

The misery of Najib's confinement starts with the deplorable baseline conditions at the two institutions where he has been detained since his arrest. As Judge Berman has noted, MCC and MDC are notoriously "dirty," "infested with drugs," and there is a prevalence of "violence." *United States v. Morgan*, No. 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), Dkt. No. 90, Tr. 12:25-15:21, 37:15-18. Judge McMahon has described the conditions at these facilities "as disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *United States v. Days*, No. 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021), Dkt. No. 35, Tr. 19:17-20. As Judge McMahon once explained in apparent exasperation:

> [T]he MCC and the MDC, two federal correctional facilities located in the City of New York[,] are run by morons, which wardens cycle repeatedly, never staying for longer than a few months or even a year. So there is no continuity, there is no leadership, there is no ability to get anything done. They lurch from crisis to crisis … none of which is the fault of … any of the other inmates I have sentenced or will sentence.

42

*Id.* 19:8-16.

Of course, by the time Najib arrived in New York City, the disgraceful baseline conditions plaguing its federal jails were exacerbated by a new, unprecedented crisis: the COVID-19 pandemic. For the greater part of the next several years, Najib was subjected to some form of lockdown or lock-in—the functional equivalent of solitary confinement. *See United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), Dkt. No. 250, Tr. 17:17-18:3 (describing the "extraordinarily harsh" conditions of frequent lockdowns during COVID-19 as "basically like solitary confinement"). During these lockdowns, which were instituted frequently for weeks at a time in response to outbreaks and surges of COVID-19, Najib could not leave his cell for visits, calls, showers, or exercise; was provided cold, inedible food; and was unable to access the already limited services in the facility.

By the end of 2023, conditions at MDC Brooklyn had become so unacceptable that Judge Furman was moved to detail its horrors in a scathing opinion, finding that the conditions there constituted "exceptional reasons" under 18 U.S.C. § 3145(c) to keep a defendant out on bail pending sentencing. In *United States v. Chavez*, 710 F. Supp. 3d 227 (S.D.N.Y. 2024), Judge Furman described in detail how the "dreadful" conditions at MDC Brooklyn impact the lives of those unfortunate enough to be housed there. "First, inmates at the MDC spend an inordinate amount of time on 'lockdown'—that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise." *Id.* at 233.

43

"Second," Judge Furman found that "MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates," and that "[i]t has become common for defense counsel to require court intervention to ensure that inmates receive basic care—and, even more shocking, not uncommon for court orders to go unheeded." *Chavez*, 710 F. Supp. 3d at 234.

Third, Judge Furman noted that "the MDC's physical conditions have long been problematic," and described how other litigations had found "visible mold on walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers." *Chavez*, 710 F. Supp. 3d at 235.

Judge Furman also observed that there have been severe staffing shortages at MDC Brooklyn for years. *Chavez*, 710 F. Supp. 3d at 229 (noting that "as of November 2023, *the MDC was operating at only about 55% of its full correctional officer staffing level*" (emphasis in original)). As Judge Furman further explained:

> A recent memo by Rhonda Barnwell, the president of the union local representing the MDC's correctional officers, helps explain why the MDC's staffing shortage translates directly into its inhumane conditions of confinement. *See United States v. Irizarry*, 23 Cr. 60 (JMF), Doc. 47-3 (S.D.N.Y. Oct. 30, 2023). According to her memo, "[o]n a daily basis housing units . . . are left . . . unmanned by staff[ ] and locked down, with the expectation . . . that a single [ ] Officer is to make rounds, feed, and perform additional correctional duties" on three units during a single shift. *Id.* at 12. The frequency of lockdowns "angers the inmates and heightens the inherent danger for staff," but "[c]overage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and[/]or inmate medical emergencies." *Id.* at 2.

*Chavez*, 710 F. Supp. 3d at 236, n.16.

Eight months after *Chavez*, Judge Brown reiterated how "dangerous, barbaric conditions … have existed for some time at the Metropolitan Detention Center in Brooklyn." *United States v. Colluci*, 12 Cr. 417 (GRB), 2024 WL 3643857, at *1 (E.D.N.Y. Aug. 5, 2024). Judge Brown summarized how judges in the Southern and Eastern Districts of New York frequently lower, reduce, or do not impose sentences of incarceration based on the conditions at MDC, including "inadequate supervision, unbridled assaults[,] and lack of sufficient medical care." *Id.* at *3.

The defense of course acknowledges the commendable efforts that BOP and the staff at MDC Brooklyn have undertaken since *Chavez* to improve the conditions at the facility. But regardless of how much the situation at the jail has improved, it is cold comfort to Najib, who lived through the worst of the worst. As Judge Brown observed in 2024, "[T]he present conditions at MDC make [time served there] materially different than [time] served at a jail or prison elsewhere in the United States that is appropriately managed." *Colucci*, 2024 WL 3643857, at *7. Najib's sentence must reflect the disproportionate punishment he has already received.

## VII.    Conclusion

For the reasons set forth herein and for any apparent at the classified and unclassified sentencing proceedings, a sentence of 18 years' imprisonment is sufficient, but not greater than necessary, to adequately punish Haji Najibullah given the totality of his personal circumstances and those surrounding his offenses.

Such a sentence will guarantee that Najib spends a significant portion of his adult life imprisoned thousands of miles away from his family. Nothing matters more to him than the chance of being able to reunite with his wife and children someday, albeit in his old age, and he prays for the opportunity.

Dated:      New York, NY
            May 27, 2026

Respectfully submitted,

Andrew John Dalack, Esq.
Ariel C. Werner, Esq.
Mark B. Gombiner, Esq.

Counsel for Haji Najibullah

46